UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

UNITED STATES OF AMERICA,         :

          v.                :           96 CR. 1098(JSR)

ANDREW RAMSAY,                 :

           Defendant.    :
--------------------------------------------------------x


## <u>MOTION FOR COMPASSIONATE RELEASE</u>


Counsel for Andrew Ramsay
Law Office of Kenneth J.Montgomery PLLC
198 Rogers Avenue
Brooklyn, NY 11225

Andrew Ramsay, by and through his undersigned counsel, respectfully submits this supplemental memorandum of law (and the attached exhibits) in support of his pro se motion, pursuant to 18 U.S.C. § 3582(c)(1)(A), for entry of an Order reducing his life sentence (of which he has already served more than 24 years) to time served.

My journey and perspective as a Federal criminal defense attorney is quite different from the majority of my colleagues, adversaries, and District Judges on the bench. I recognized the distinction during my first year of law school in 1994 while a student at Fordham Law school. That distinction was further reinforced as a young prosecutor at the Brooklyn District Attorney's office in 1997. By 1997 I was no longer a young child growing up in Brownsville Brooklyn. Although I had somehow survived Brownsville in the 70's-90's to attend college, Brownsville still remained the same. Brownsville was a neighborhood made up of proud and resilient people who had weathered the devastation of heroin, aids, crack, unemployment, guns and violence. While growing up in Brownsville I was fortunate to meet some of the most thoughtful and brilliant young people I would ever meet, many of them despite their brilliance and dreams already had their fate sealed when we were children. I remember in the Brooklyn District Attorney's Office many of my colleagues expressing shock that I actually grew up in a place like Brownsville, in hindsight I guess it was their way of acknowledging that in this system I wasn't supposed to survive Brownsville, much less end up in the same time and space and profession as them.  That perspective in life provided me with insight and context as to what occurred not only in my life but in the life of Andrew Ramsay and hundreds of my friends, peers, and relatives. Many people

through achievement and success believe that it's their unique and ingenious rugged individualism that solidifies their destiny as opposed to the power of systems. Surviving a neighborhood that historically- is consistently socially, politically, economically, and academically alienated provides you with a unique perspective regarding systems. It is with that perspective that I understand how 18 year old Andrew Ramsay in 1992 could find himself involved in the street drug trade in the Bronx. That perspective also provides wisdom in understanding how Andrew Ramsay's life seemed to be well out of control by 18 years of age, ultimately having him and his co-defendants take part in the death of three individuals at a block party in the Bronx. Andrew and his co-defendants had been summoned by the leader of the "Crotona avenue boys" to retaliate against a rival member of the "Clay avenue" gang. I am actually only one year older than Andrew Ramsay and in preparing this motion it brought me back to my childhood and teenage years of growing up in New York City. The death, drugs  and incarceration that had consumed the young men in my generation during that time was simply unfathomable to comprehend as a young person. As an adult who lived through it, it is just as unfathomable to now be able to see how that death, destruction and dysfunction has been commodified into entertainment and culture. We now have a long list of young men of color and corporations who have become millionaires and some even billionaires off of the destruction and poverty that permeated the neighborhoods where young kids like Andrew Ramsay were trapped in. Meanwhile a generation of young men and women have spent decades in prison and many have died off of the deadly scourge of poverty and a drug epidemic that is still ravaging communities.  Andrew and myself  are connected by history and systems but separated by time, space, and fortune. I was fortunate to have a community intact and not broken by the dysfunction, Andrew was not as fortunate.

Andrew Ramsay, by and through his undersigned counsel, respectfully submits this

memorandum of law (and the attached exhibits) in support of his motion, pursuant to 18 U.S.C. §

3582(c)(1)(A), for entry of an Order reducing his life sentence (of which he has already served

more than 24 years) to time served.

## INTRODUCTION

Some 24 years ago, this Court opined the following:

…..Despite the very serious nature of the offense here involved that resulted in the wanton murder of three persons, and despite the obvious need in such circumstances for a very severe sentence, both to punish the defendant for this terrible deed and to deter others, the Court, like many other courts, is not entirely comfortable with the fact that the sentencing guidelines leave no meaningful discretion in this situation. But I have neither been furnished with any requests for departure nor seen on my own any likely basis on which a departure could be considered. Therefore, I am bound by the requirements of the guidelines in this respect………

The egregiousess of the offense is obvious. The need for a very severe sentence is obvious. What is not so obvious is that a determination by the sentencing commission that a 24-year-old person who, on the record before the Court, is not without promise of salvageability as a responsible person, is in effect determined to be someone whom society will forever remove from its everyday affairs. I can't totally escape the notion that on all the facts and circumstances of this case, extreme though they be in terms of the awfulness of what Mr. Ramsey did, that society as a whole is not entirely well served by adding, in effect, a fourth removal from the everyday world to the three who were so brutally taken away from this world. But it would be an absolute flat derogation of duty on my part not to impose the law as the law is written. So I make these remarks only for whatever small benefit they might have to the sentencing commission in the future cases where the sentence of human beings, whether good or not, so readily defined, it seems to me, as to be excluded from the exercise of the discretion of the court that has had more nuanced inputs than any court has in any case before it. But there it is.

24 years ago this Court eloquently and briefly described the collision between

the rule of law and humanity that dictates the limitations of the federal sentencing

guidelines. Begging the question -How could a young man who had committed a

crime at 18 years of age be deemed incapable of entering society ever again? The

finality of sentencing is very resolute in our federal system. Congress with the

Sentencing Reform Act of 1984, allowed the U.S. Bureau  of Prisons (the "BOP")

with the discretion to revisit and review the sentences imposed on a few narrow

categories by defendants. But the BOP largely has not exercised that authority, even

for  defendants who were sentenced decades ago, even for defendants serving

exceedingly long  prison terms or even for defendants for whom continued

confinement can no longer readily be  justified on moral or utilitarian grounds.

Responding to concerns that the BOP was not making adequate use of its legal  authority to

seek sentence reductions for qualified defendants, Congress recently vested federal  judges with

the power to do what they were previously prohibited from doing absent a motion  from the

Director of the BOP. Specifically, changes to 18 U.S.C. § 3582(c)(1)(A) contained in  the First

Step Act (which was signed into law on December 21, 2018) authorize courts (after a

defendant has exhausted his/her administrative remedies) to reduce the prison term – even to

time served – of any defendant if it finds that "extraordinary and compelling reasons" warrant

such a reduction. Federal judges are now empowered to take a "second look" at  the sentences

imposed on defendants who are deserving and worthy of a "second look."

Andrew Ramsay –  who is serving the 24th year of a  life sentence federal

sentence involving a shooting that occurred when he was 18 years of age [1]– is deserving and

worthy of  a "second look." Mr. Ramsay also served three years in state custody prior to his

federal conviction. Both of his co-defendants were convicted in state court and never prosecuted

in federal custody. And, as set forth below,  "extraordinary and compelling reasons" warrant a

---

[1] In 2012 The Supreme Court in Miller v. Alabama, held that mandatory life imprisonment without parole for those under 18 years of age at the time of their crime violates the eighth amendment's prohibition on cruel and usual punishment. While Andrew committed this crime well into his 18th year the point is that even the Supreme Court recognizes the cruelty of sentencing teenagers to life imprisonment.

reduction of his life sentence to time served.  Accordingly and for all the reasons detailed below, we respectfully request that this Court enter an Order, pursuant to 18 U.S.C. § 3582(c)(1)(A), reducing Mr. Ramsay's life sentence to time  served (or, alternatively, to a term of years short of life that this Court finds is consistent with 18 U.S.C. § 3553(a)).

## PERSONAL BACKGROUND

Mr. Ramsay, age 46, was born and raised in Jamaica until 10 years of age, when his mother moved to New York City, with his younger siblings from another relationship. Mr. Ramsay in many regards is a study of what happens to a small child in a family that immigrated to foreign country without  community and adequate parental supervision. Andrew's single mother was struggling to provide a better way of life. She had no idea of the dangers of trying to raise a young boy in a community that had all the historical indicia of systemic oppression. Andrew's mother had no way of preparing her young son for the crack and heroin drug trade and the violence that follows with it. Andrew would follow the path of many before and after him that perceived criminality as a pathway out of poverty. Andrew suffered greatly and had all the underlying risk factors that traditionally lead to crime. His elderly grandmother was charged to raise him in an environment consumed by drugs, violence and poverty. Andrew dropped out of school by the 9th grade, he had attended school so infrequently that his teachers had no record of him even attending as detailed in the PSR done in his case from 1997. To no surprise and at an early age Andrew was recruited by the older kids to join the "Croton avenue boys".  The acceptance into that crew for a young impressionable immigrant boy trying to fight poverty and systemic oppression was of serious importance. Any semblance of family was torn apart and lost during the family's journey from Jamaica to the Bronx. The acceptance of belonging was provided by acceptance in the community from his peers and older kids who were much more

savvy in the street life than Andrew.  By 1996 Andrew's father had grown ill and had died, his

primary rearing was left up to his elderly grandmother. Street life had taken the place of family

and structure paving the way for a lifetime of dysfunction that was solidified by his federal life

sentence before this Court.  Despite the dysfunction of incarceration and the finality of  a life

sentence Andrew has managed to maintain a close and loving family relationship with his

family. His siblings are very instrumental in his life and provide community for him. We will

never get to see what Andrew's life could have been. Dysfunction and poverty would seal

Andrew's fate even before his involvement in the drug trade. The shooting with his

co-defendants – a  terrible decision that changed the course of his life and is one that he has

long regretted and reflected on. In our discussion of his life Andrew succinctly and eloquently

stated that "as a young kid you are overwhelmed by the lack of positive choices and things get

so bad that you convince yourself of things that your older self will tell you was the wrong

choices, I was just trying to survive but I had no real tools to survive".  Andrew in our

conversations expresses hope that his two children who he never got to raise because they were

so young when he was incarcerated, both have the community that he didn't have and hopefully

his life can serve as a cautionary tale for them. He hopes one day to resume a real relationship

with them.


FACTUAL BACKGROUND


    A. <u>Mr. Ramsay's Offense Conduct</u>

Prior to his participation in this crime, Mr. Ramsay was a member of the "Crotona avenue boys".

The "Crotona avenue boys" were headed by David Russell, on September 7, 1992 Russell had

recruited Andre Ramsay, Peter Davis and Dennis Latchman to shoot at a rival Clay avenue gang

member. During that shooting two innocent bystanders were killed. One of the bystanders was

also pregnant at the time of the shooting. The infant had died after her mother had delivered her prior to the mother's death.  Andrew was originally arrested in 1993 by state authorities. State charges were ultimately dropped and Andrew was prosecuted in 1996 by Federal Authorities. Both Peter Davis and Dennis Latchman were both convicted in the State and not charged federally. They both served their time and were released.

THIS COURT HAS THE AUTHORITY TO REDUCE MR. RAMSAY'S
SENTENCE TO TIME SERVED PURSUANT TO 18 U.S.C. § 3582(c)(1)(A)

With the changes to 18 U.S.C. § 3582(c)(1)(A) contained in the First Step Act,  district courts no longer need to await a motion from the Director of the BOP before reducing a defendant's sentence based on the existence of "extraordinary and  compelling" circumstances. Today, district courts may do so directly upon the filing of a motion by a defendant after the earlier of the following two events: (1) rejection by the warden  of the facility in which a defendant is being held of a request for an 18 U.S.C. § 3582(c)(1)(A)  sentence reduction motion; or (2) the lapse of 30 days from the receipt of such a request by the warden of such facility.

Moreover, the "extraordinary and compelling reasons" upon which district courts  may reduce a sentence are no longer limited to medical condition, age and family circumstances. Rather, today, no limits exist as to the "extraordinary and compelling reasons" that might warrant a sentence reduction pursuant to 18 U.S.C. § 3582(c)(1)(A). This Court therefore is free to determine on its own whether "extraordinary and compelling reasons" exist such that a reduction of Mr. Ramsay's life sentence (to time served or otherwise) is warranted.

A. Congress Intended to Empower District Courts to Reduce
     Sentences Based on "Extraordinary and Compelling Reasons"
     Other than Medical Condition, Age and Family Circumstances

Congress first enacted the modern form of the "compassionate release" appearing in 18 U.S.C. § 3582 as part of the Comprehensive Crime Control Act of 1984. That legislation included (among other things) the major sentencing reforms reflected in the Sentencing Reform Act of 1984, including the abolition of parole and the implementation of the Guidelines, which combined to ensure that most defendants would serve in full the terms of imprisonment imposed on them at initial sentencing (save for limited "good-time" credit). Recognizing that the abolition of parole would eliminate the criminal justice system's means for adjusting to changed circumstances, Congress created a number of statutory sentence adjustment provisions, which are collectively codified in 18 U.S.C. § 3582(c). See generally Shon Hopwood, *Second Looks & Second Chances*, Cardozo Law Review (forthcoming 2019) (available today at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3404899). As relevant here, 18 U.S.C. § 3582(c)(1)(A) provides that district courts can modify a "final term of imprisonment" if "extraordinary and compelling reasons warrant such a reduction." Three points worth noting with regard to the operation of 18 U.S.C. § 3582(c)(1)(A):

First, Congress empowered district courts, not the U.S. Parole Commission, to decide, in individual cases, if "there is a justification for reducing a term of imprisonment." See S. Rep. No. 98-225, at 56 (1983). Congress envisioned 18 U.S.C. § 3582(c)(1)(A) acting as a "safety valve[] for [the] modification of sentences" and intended for district courts to be able to reduce sentences when justified by the various factors and reasons that the U.S. Parole Commission previously had considered in making parole determinations. Id. at 121. Lawmakers further noted that the foregoing approach would keep "the sentencing power in the judiciary where it belongs," rather than with the U.S. Parole Commission, and that 18 U.S.C. § 3582(c)(1)(A) would allow for the "later review of sentences in particularly compelling

situations." Id. This legislative history demonstrates that Congress, in passing the Comprehensive Crime Control Act of 1984, intended to give district courts an equitable power to employ on an individualized basis to correct sentences when "extraordinary and compelling reasons" indicate that the sentence initially imposed on any individual defendant no longer served legislative objectives.  Second, although the power to reduce sentences provided for by 18 U.S.C. §  3582(c)(1)(A) has most often been used to reduce the prison terms of elderly and/or terminally ill  defendants, nothing in the statutory language or legislative history of 18 U.S.C. § 3582(c)  indicates that Congress intended to limit its application to elderly defendants or defendants with  compelling medical circumstances. Rather, if a judge finds the existence of any "extraordinary  and compelling reasons" warranting a sentence reduction, those reasons could, pursuant to 18  U.S.C. § 3582(c)(1)(A), form the legal basis for the reduction "of an unusually long sentence." Id. at 55-56. Indeed, the legislative history of 18 U.S.C. § 3582(c)(1)(A) indicates that  lawmakers thought that "extraordinary and compelling reasons" for a sentence reduction should  not be limited to medical conditions, age and family circumstances. In particular, recognizing  that parole had historically played a key role in the federal criminal justice system, legislators  explained how some defendants may warrant a sentence reduction (after service of some period  of incarceration) based on any number of "circumstances":

> The [Senate Judiciary] Committee believes that there may be unusual cases in which an eventual reduction in the length of a term of imprisonment is justified by changed circumstances. These would include cases of severe illness, *cases in which other extraordinary and compelling circumstances justify a reduction of an unusually long sentence*, and some cases in which the sentencing guidelines for the offense of which the defendant was convicted have been later amended to provide a shorter term of imprisonment.

Id. at 55-56 (1983) (emphasis added).

Third, notwithstanding all of the foregoing, Congress conditioned the reduction of any "final term of imprisonment" pursuant to 18 U.S.C. § 3582(c)(1)(A) on the filing of a motion by the Director of the BOP requesting such a reduction. Thus, district courts – until the recently enacted First Step Act – were only authorized to reduce a sentence based on "extraordinary and compelling reasons" if asked to do so by the Director of the BOP.

> B. The U.S. Sentencing Commission Has Indicated that the
> "Extraordinary and Compelling Reasons" Upon Which a Sentence
> Reduction Pursuant to 18 U.S.C. § 3582(c)(1)(A) May Be Based Are
> Not Limited to Medical Condition, Age and Family Circumstances

In enacting the Comprehensive Crime Control Act of 1984, Congress tasked the  U.S. Sentencing Commission (the "Sentencing Commission") with responsibility for developing standards for identifying the existence of "extraordinary and compelling reasons" for a sentence reduction. See 28 U.S.C. § 994(t) ("The Commission . . . shall describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied and a list of specific examples"). The Sentencing Commission, though, initially neglected that legislatively mandated obligation. But in 2007 the Sentencing Commission finally acted, promulgating a policy statement advising that "extraordinary and compelling reasons" warranting a sentence reduction could include medical condition, age, family circumstances and "other reasons." See U.S.S.G. § 1B1.13, Application Note 1(A) (Amendment 698). Notwithstanding the foregoing, in April 2013 the Office of the Inspector General  of the U.S. Department of Justice (the "OIG") issued a scathing report finding that the Director  of the BOP rarely filed 18 U.S.C. § 3582(c)(1)(A) sentence reduction motions (even for  defendants who clearly met the Sentencing Commission's objective criteria for a sentence  reduction). See U.S. Dep't of Justice Office of the Inspector General, *The Federal Bureau of  Prisons' Compassionate*

*Release Program* (Apr. 2013) (Exhibit 20).[11] In response, the Sentencing Commission expanded its guidance to district courts on qualifying circumstances and encouraged the BOP to file 18 U.S.C. § 3582(c)(1)(A) motions whenever a defendant meets the criteria set forth in Section 1B1.13 of the Guidelines. See U.S.S.G. § 1B1.13, Application Note 4; United States v. Dimasi, 220 F. Supp. 3d 173, 175 (D. Mass. 2016) (discussing the progression from the OIG report to new "encouraging" guidelines). In doing so, the Sentencing Commission identified several categories of qualifying "extraordinary and compelling reasons," including medical condition, age, family circumstances and "[o]ther reasons, for circumstances in which the Director of the BOP determines that there is an extraordinary and compelling reason other than, or in combination with," medical condition, age and family circumstances. U.S.S.G. § 1B1.13, Application Note 1(A) (internal quotation marks omitted). The Sentencing Commission also clarified that "extraordinary and compelling reasons" need "not have been unforeseen at the time of sentencing in order to warrant" a sentence reduction. Id., Application Note 2. In other words, an "extraordinary and compelling" reason for a sentence reduction that could have been known or anticipated by a district court at the time of initial sentencing "does not preclude [its] consideration" for a sentence reduction. Id.

The Sentencing Commission, consistent with the text and legislative history of 18 U.S.C. § 3582(c)(1)(A), concluded that reasons beyond medical condition, age and family circumstances could constitute "extraordinary and compelling reasons" for a sentence reduction and that those "extraordinary and compelling reasons" need not necessarily relate to a defendant's circumstances after sentencing. One other significant point bears noting: Congress set forth only one limitation when it delegated authority to the Sentencing Commission to develop standards for identifying "extraordinary and compelling reasons" for a sentence

reduction: "Rehabilitation of the defendant <u>alone</u> shall not be considered an extraordinary and compelling reason." 28 U.S.C. § 994(t) (emphasis added). Lawmakers no doubt legislated that sole limitation so that district courts would not use a defendant's rehabilitation, standing alone, as a basis for a sentence reduction, thereby creating a direct substitute for the parole system that Congress abolished when it passed the Comprehensive Crime Control Act of 1984. But legislators' use of the modifier "alone" evidences that they believed that rehabilitation <u>is relevant</u> to the question of whether a sentence should be reduced and that rehabilitation, when considered together with other equitable factors, could constitute "extraordinary and compelling reasons" for a sentence reduction.

  C. The First Step Act Authorizes Federal Courts to Reduce Sentences
    <u>Based on Virtually Any "Extraordinary and Compelling Reasons"</u>

    As detailed above, district courts, before the First Step Act, could only reduce a defendant's sentence if the Director of the BOP filed a motion before the district court requesting such relief. <u>See</u> <u>United States v. Beck</u>, Case No. 13-CR-186-6, 2019 WL 2716505, at *4 (W.D.N.C. June 28, 2019) ("Before passage of the First Step Act of 2018, district courts could grant compassionate release sentence reductions only upon a motion by the BOP Director"). District courts had no authority before the First Step Act (absent the filing of a motion by the Director of the BOP) to reduce the sentence of any defendant, even if a defendant presented "extraordinary and compelling reasons" for a sentence reduction (either as determined by a judge or as defined by the Sentencing Commission in Section 1B1.13 of the Guidelines). Thus, practically speaking, the Director of the BOP was unilaterally empowered to determine which defendants presented "extraordinary and compelling reasons" for a sentence reduction and was the only individual authorized by law to initiate a sentence reduction proceeding.[12] Even the U.S. Department of Justice recognized that, before passage of the First Step Act, the BOP (not the

Sentencing Commission, a defendant, a prosecutor or even a  judge) functionally had final say on

what constituted an "extraordinary and compelling reason"  for a sentence reduction because only

the Director of the BOP could file an 18 U.S.C. §  3582(c)(1)(A) sentence reduction motion. See

U.S. Dep't of Justice, Letter to Gilberto Hinojosa,

[12] The BOP's policies and procedures concerning 18 U.S.C. § 3582(c)(1)(A) sentence
reduction motions in existence before passage of the First Step Act are found in "Program
Statement 5050.49 – Compassionate Release/Reduction in Sentence: Procedures for
Implementation of 18 U.S.C. §§ 3582(c)(1)(A) and 4205(g)" (March 25, 2015). See
https://www.bop.gov/policy/progstat/5050_049_CN-1.pdf.

Chairman, U.S. Sentencing Commission (July 14, 2007) (Exhibit 21) (noting that because

Congress authorized the BOP alone to determine which defendants to bring to a court's attention

for a potential sentence reduction, "it would be senseless [for the Sentencing Commission] to

issue policy statements allowing the court to grant such motions on a broader basis than the

responsible agency will seek them"). The OIG found that leaving the Director of the BOP with

such unilateral and unqualified authority created several problems. Among other things, the OIG

found that the  BOP: (1) failed to provide adequate guidance to staff on the criteria for 18 U.S.C.

§  3582(c)(1)(A) motions; (2) failed to set time-lines for the review of requests for 18 U.S.C. §

3582(c)(1)(A) motions; (3) failed to create formal procedures for informing defendants about 18

U.S.C. § 3582(c)(1)(A); and (4) failed to generate a system for tracking requests for 18 U.S.C. §

3582(c)(1)(A) motions. See Exhibit 20 at i–iv. Thus, the OIG concluded that the "BOP does not

properly manage the compassionate release program, resulting in inmates who may be eligible

candidates for release not being considered." Id. See also Stephen R. Sady & Lynn Deffebach,

*Second Look Resentencing Under 18 U.S.C. § 3582(c) as an Example of Bureau of Prisons*

*Policies That Result in Overincarceration*, 21 Fed. Sent. Rptr. 167 (Feb. 2009).

Congress heard and acted on those complaints. In late 2018 it passed the First Step Act, which fundamentally transformed the process by which 18 U.S.C. § 3582(c)(1)(A) sentence reduction motions were adjudicated. In particular, instead of relying on the Director of the BOP to determine whether "extraordinary and compelling reasons" exist supportive of a sentence reduction and instead of relying on the Director of the BOP to file an 18 U.S.C. § 3582(c)(1)(A) sentence reduction motion, district courts today can resentence a defendant "upon motion of the defendant" as long as a defendant first files a request for a sentence reduction motion with the warden of the facility in which s/he is being held that is rejected or the lapse of 30 days "from the receipt of such a request by the warden of the defendant's facility," whichever happens first. See 18 U.S.C. § 3582(c)(1)(A); Beck, 2019 WL 2716505, at *5 ("Among other things, [the First Step Act] add[s] a provision allowing courts to consider motions by defendants for compassionate release without a motion by the BoP Director so long as the defendant has asked the Director to bring such a motion the Director fails or refuses").

Thus, once a defendant files an 18 U.S.C. § 3582(c)(1)(A) sentence reduction motion after the occurrence of either of the two foregoing events, a district court may reduce that defendant's sentence to time served (or any other prison term short of the initial sentence) if it finds that: (1) "extraordinary and compelling reasons" exist for a sentence reduction after considering the 18 U.S.C. § 3553(a) factors; and (2) a reduced prison term is consistent with the applicable policy statements set forth in Section 1B1.13 of the Guidelines. See Beck, 2019 WL 2716505, at *6 ("Thus, courts may, on motions by defendants, consider whether a sentence reduction is warranted for extraordinary and compelling reasons other than those specifically identified in the application notes to the old policy statement").[13]

[13] Nothing in 18 U.S.C. § 3582(c)(1)(A) precludes a district court from resentencing a defendant who presents "extraordinary and compelling reasons" for a sentence reduction to a prison term that is shorter than any mandatory minimum (including, as applicable here, the mandatory life sentence provided for by 21 U.S.C. § 848(b)).

Also, notably, 18 U.S.C. § 3582(c)(1)(A) sentence reduction motions do not constitute an appeal or review of a BOP determination on a request for such a sentence reduction motion. Rather, any such motion is filed and considered on a *de novo* basis. See Beck, 2019 WL 2716505, at *13 ("the terms of the First Step Act give courts independent authority to grant motions for compassionate release and says nothing about deference to BoP, thus establishing that Congress wants courts to take a *de novo* look at compassionate release motions").

Congress made the foregoing changes in an effort to expand the use of 18 U.S.C. § 3582(c)(1)(A) in the reduction of sentences that no longer serve the penological objectives of the federal criminal justice system. Thus, today, federal judges have the power to order sentence reductions and, in doing so, are authorized to reduce prison terms (even to time served) on the full array of grounds reasonably encompassed by the phrase "extraordinary and compelling reasons." Put differently, relief under 18 U.S.C. § 3582(c)(1)(A) is now available to any defendant whose conditions have changed such that a fair-minded person could conclude that "extraordinary and compelling" reasons for a sentence reduction exist. United States v. Cantu-Rivera, Case No. 89-CR-204, 2019 WL 2578272 (S.D. Tex. June 24, 2019) is instructive with regard to this Court's newfound authority to reduce sentences based on "extraordinary and compelling reasons" (even if those reasons do not relate to medical condition, age or family circumstances). Initially, the court in Cantu-Rivera explained that "[t]he First Step Act of 2018 amended 18 U.S.C. § 3582(c)(1)(A) to allow district courts to modify sentences of

imprisonment upon motion by the defendant if the defendant has  fully exhausted all [BOP] administrative rights . . . or 30 days from the receipt of such a request  by the warden of the defendant's facility, whichever is earlier." Id. at *1 (internal quotation  marks omitted). It then reduced that defendant's life sentence (for conspiracy to possess with  intent to distribute in excess of five kilograms of cocaine) to time served (after service of more  than 30 years imprisonment) based principally on "the extraordinary degree of rehabilitation Mr.  Cantu-Rivera has accomplished during the 30 years he has been incarcerated," including  "extensive educational achievements," such as "completion of over 4,000 hours of teaching  while in federal prison to complete a Teaching Aide apprenticeship with the Department of  Labor," his "service as a teaching assistant in several prison facilities for high-school  equivalency and English-as-a-Second-Language programs" and "his service in the BOP's suicide  watch program, helping to care for inmates placed in solitary confinement due to suicide attempts." Id. at *2.

Similarly, in United States v. Cantu, Case No. 05-CR-458, 2019 WL 2498923 (S.D. Tex. June 17, 2019) the court properly noted that "[a] court may now," pursuant to 18 U.S.C. § 3582(c)(1)(A), "modify a defendant's sentence if it finds on either the BOP's or the defendant's motion that 'extraordinary and compelling reasons warrant such a reduction' and 'such a reduction is consistent with applicable policy statements issued by the Sentencing Commission.'" Id. at *1. It then reduced that defendant's 290-month sentence (which had previously been reduced to 210 months based on Amendments 782 and 788 to the Guidelines) to time served (after service of more than 14 years imprisonment) based principally on his medical condition, even though he "ha[d] not presented evidence that his reasons are extraordinary and compelling under the three explicitly defined reasons" set forth in Application Note 1 to Section

1B1.13 of the Guidelines. Id. at *3. And, in United States v. McGraw, Case No. 02-CR-00018, 2019 WL 2059488 (S.D. Ind. May 9, 2019) the court stated that the First Step Act's modification of 18 U.S.C. § 3582(c)(1)(A) "now provides an avenue for a defendant to seek a [sentence reduction directly] from the Court" and that "courts have universally turned to U.S.S.G. § 1B1.13 to provide guidance on the 'extraordinary and compelling reasons' that may warrant a sentence reduction." Id. at *1. It then reduced that defendant's life sentence (for possession with intent to distribute methamphetamine) to time served (after service of more than 17 years imprisonment) based principally on "his serious medical conditions,". Mr. Ramsay has also exhausted his administrative remedies for the filing of an 18 U.S.C. § 3582(c)(1)(A) sentence reduction motion directly with this Court.

### EXTRAORDINARY AND COMPELLING REASONS SUPPORT THE REDUCTION OF MR. RAMSAY'S LIFE SENTENCE TO TIME SERVED

Prior to this conviction and sentence Andrew Ramsay had no prior convictions or incarceration. It is clear through the passage of time and the decision in Miller v. Alabama in 2012 that if the crime had been committed today that Andrew's age would have perhaps provided a different analysis by the Government. It has been 28 years and counting since Andrew Ramsay was incarcerated initially in state court before being writted into Federal custody. 28 years is a very long time for anyone to serve in prison. Andrew Ramsay by his own account says that he was not prepared as a young man to deal with the difficulties of prison, he was not educated and he was very ignorant to many things about life, family and community when he was first incarcerated. He has been haunted by the deaths of those who have lost their lives, but he is resolute in his belief that this life sentence does not define who he is as a person. Andrew Ramsay isn't a teenager anymore and he isn't a young man in his early twenties. 28

years is a long time to reflect on your actions, it is also adequate punishment for such a serious crime where others were also responsible but have not served the amount of time as Andrew Ramsay. Andrew is no longer the lost kid born into a cycle of dysfunction. He is now a reflective and thoughtful 48 year old man who is still evolving into his better self. Even though Andrew has had no realistic hope of release he has attempted to better himself while in prison. The social worker from the facility where he is incarcerated remarked to me that Andrew is a respectful person.  The institutionalization of Andrew Ramsay has not diminished his humanity and hope. Andrew does not  seek to justify, diminish or detract from the seriousness of his offenses and the l;ives that were lost. Andrew accepts responsibility for his criminal conduct. Andrew Ramsay respectfully submit that "extraordinary and compelling reasons" exist  for the reduction of his life sentence and that this Court should, pursuant to 18 U.S.C. §  3582(c)(1)(A), enter an Order reducing Andrew Ramsay's life sentence to time served (or,  alternatively, to a term of years short of life that this Court finds is consistent with the dictates of  18 U.S.C. § 3553(a)). Because of his age at the time of the crime and the length of time that Andrew Ramsay has been incarcerated highlights the extraordinary and compelling reasons for his release. His continued incarceration seems against the interest of justice and represents a disparity in sentencing since his co-defendant's were state paroled for their role in the same crime. One key sentencing factor stressed by Congress in 18 U.S.C. § 3553(a) is "the  need to avoid unwarranted sentence disparities" among similarly situated defendants.Additionally, although Congress has provided that rehabilitation alone cannot serve as  an  "extraordinary and compelling reason" for a sentence reduction, Andrew Ramsay's educational and  rehabilitative history in the Bureau of Prisons are reflective of a young man who entered federal prison as a young man who did not give up on life despite having a life sentence. With his institutional record the positives outweigh

the negatives.

<u>CONCLUSION</u>

Humans are layered,  and depending on your unique life journey the complexity of that layering can determine your capacity as a human to find and seek redemption. Our ideas of justice as a society may be outdated in realizing the ability of humans to evolve. There is absolutely no way to determine an individual's capacity to change.  This Court at sentencing some 24 years ago identified the inhumanity that is applied in determining punishment. If we start from the premise that some young people grow up in what some would consider unimaginable conditions then it's a lot easier to understand the trauma that is present in many young lives like Andrew Ramsay. This Court has seen thousands of individuals follow the same path as Andrew. Thousands of individuals who lacked the free and autonomous space and time to make good decisions from viable opportunity.

The social costs of locking individuals up forever at such a young age is a heavy price to pay for society. Moreover, there is little reason to believe that a life sentence for a crime committed at 18 years of age has any correlation or causal relationship to curbing crime. What our society has yet to witness is a thoughtfully and sustained  intelligent response to poverty, dysfunction, violence and poor education- all the underlying phenomenon that produce crime. Recently during a proffer session concerning a group of young men involved in crimes in the Bronx similar to Andrews crime, I had a brief conversation with the prosecutor. I explained to the prosecutor that there has to be a force equal to the force holding young men like Andrew responsible for their crimes. That force has to be preoccupied with providing education, community and tools to succeed in a society that traditionally alienates these young men socially, politically, and economically. If that force is working there will be less Andrew Ramsay's and

others to be sentenced to life. The  social costs to society and the need to  give people a "second chance" all militate in favor of identifying people like Andrew Ramsay and  considering them for release pursuant to 18 U.S.C. § 3582(c)(1)(A). Finally, the life sentence imposed on Andrew Ramsay – a first-time, violent  offender – who was 18 at the time of the crime in 1992 and was also 1 of 3 defendants reflected the social, political and criminal justice climate  of the time. We are also reminded that we exist in a system where those who have committed similar actsas Andrew Ramsay and in many cases far more egregious acts are given non life sentences either through regular plea agreements or cooperation agreements. So as a society we realize that there are humans that we are comfortable with being released back into society despite the violent acts they committed. A review of Andrew Ramsay's sentence with relief in mind by a wise and thoughtful Court that was also the Trial Court is a good sign that the rule of law does put humanity first and it reflects a criminal justice system that is connected to society.

Accordingly and for all of the foregoing reasons, we respectfully submit that this Court should enter an Order, pursuant to 18 U.S.C. § 3582(c)(1)(A), reducing defendant Andrew Ramsay's life sentence to time served (or, alternatively, to a term of years short of life that it finds  is consistent with the dictates of 18 U.S.C. § 3553(a)).

Dated: New York, NY
        September 28, 2020

Respectfully submitted,

*Kenneth J. Montgomery, esq*

Law Office of KJM PLLC
198 Rogers avenue
Brooklyn, New York 11225