Conrad Lindo
Mitigation Specialist
144 West 127 Street
New York, NY 10027
646-258-8242
conradlindo@yahoo.com


October 20, 2020


Kenneth Montgomery, Esq.
Attorney at Law
198 Rogers Avenue
Brooklyn, NY 11225

Re Andrew Ramsay

Dear Mr. Montgomery:

The following is a mitigation report on behalf of your client, Andrew Ramsay.     In keeping with the investigation for this report, telephone interviews were conducted with Mr. Ramsay on multiple occasions.    It was not possible to meet with Mr. Ramsay due to the bar on legal visits to Bureau of Prisons (BOP) facilities related to COVID-19 pandemic.    In addition to Mr. Ramsay, interviews were conducted with his siblings, extended family members, and close friends: Ann Marie Bendigo (sister), Marlon Reid (brother), Colleen Thompson (girlfriend), Roy Bartley ("Dad"), Sharon (Jennifer) Mitchel ("cousin"), Juliana Facey ("cousin"), Derrick McKennon (friend), Aquilla McKennon (friend), Nicola Taylor (friend; sister of girlfriend), Sharon Brown (friend).     Interviews with Mr. Reid and Ms. Thompson were conducted in person and on the phone.  All other interviews were done by phone.    Reviews were done of the 1997 sentencing transcript, the 1997 presentencing report by the US probation officer, records corroborating Mr. Ramsay's educational and vocational programs while in BOP custody, and letters of support from family members and friends.    Special education records and correctional health records have been requested but not obtained as of the date of this report.

RAMSAY, ANDREW

**Introduction**

      Andrew Ramsay is a 47-year-old male of Jamaican heritage who is currently incarcerated at the Federal Correctional Institution Schuylkill, Pennsylvania., which is a medium security facility.   He was 18 years old at the time of the incident for which he was convicted and 23 years old at time of conviction. With the passage of time, and changing circumstances, it is now understood that the Court has discretion to grant Mr. Ramsay relief related to the length of his sentencing.   An investigation of Mr. Ramsay's psychosocial history is supportive of the consideration for relief.   The investigation reveals a host of significant mitigating factors, which might not have been available to be considered by the Court in 1997.   These factors had an extraordinary impact on Mr. Ramsay's childhood or developmental years, with some contributing to severe trauma and to delays in his cognitive and emotional maturation at the time of the offense for which he was convicted.   The investigation for this report also reveals that Mr. Ramsay's life has changed over time due to his growth mentally, emotionally, spiritually, morally, behaviorally, and occupationally while incarcerated.

**Family Background**

      Andrew Ramsay was born on September 14, 1973 to the late Cavina Bennett-Brown (nee Williams) in Jamaica.   His twin brother, Arthur Ramsay, died about a month after birth.   Andrew has three maternal half-siblings, Ann Marie Bendigo (age 49), Marlon Reid (age 41) and Jermaine Bennett (age 37).  Ann Marie works as a certified nursing assistant and resides in Hollywood, Florida.  Marlon works in maintenance at the Metropolitan Transit Authority in New York City and resides with his wife, his son and stepdaughter in West Haven, Connecticut.  Jermaine was diagnosed with Autism in childhood and currently resides with Ann Marie in Florida.

      Andrew met five or six men whom his mother claimed was his biological father.   The last man introduced to Andrew as his father was Ever Hue, who resided in Jamaica and is reportedly deceased. However, Andrew never had any interaction with Ever Hue in childhood.  Until he migrated to the United States, the man Andrew was led to believe was his biological father was Eral Ramsay, whose surname he bears.

      Reportedly, Eral died of cancer in 1996 while Andrew was in federal custody.  Eral was born and raised in Jamaica but migrated to the United States when Andrew was a young child.   According to Andrew's sister, Ann Marie, Eral worked as a tailor in a clothing establishment up until the time of his death.

2

RAMSAY, ANDREW

Andrew's mother, Cavina Bennett-Brown, was murdered while she was in Jamaica on September 3, 2011.   The circumstances under which she was killed remain shrouded in rumor and mystery, according to family members.   Cavina's death attracted media reports in New York City but with little detail.   According to family members, she had just left the Jamaican home of her then husband, Peter Brown, when gunmen shot her multiple times as she sat in her car.

Family members revealed that Cavina's death remains devastating because nobody was convicted for her murder.   A concern expressed by family members is that Cavina exercised poor judgment in men including those she married, which may have been a factor in her death.

Cavina was 57 years old when she died.  She was born in Jamaica in 1954 and migrated to the United States when Andrew was about 4 or 5 years old.   She settled in the Bronx, New York, and worked primarily as a home health aide.   After her migration, she had her third child Marlon Reid, on December 30, 1979, and her fourth child Jermaine Bennett on July 1, 1983.   Her relationship with Marlon's father ended before she became involved with Jermaine's father Tony Bennett, whom she married.

Cavina's marriage to Tony Bennett was unstable and unsustainable.   Tony was a man of the streets and had a record of arrests and incarcerations.   His conduct put added pressure on Cavina to be the sole provider for her children.  Her last child, Jermaine, had special needs due to autism but Cavina was not getting any support from Tony to help care for the child.   Neither was she getting any support from Marlon's father.   As with her prior relationship with Marlon's father, her marriage to Tony petered out with little to show for it other than a fatherless child.

In addition to supporting her two children in the US, Cavina had to send money to Jamaica to support Andrew and his older sister, Ann Marie, until they could join her.   She worked two to three jobs per day; a routine she would maintain for several years even at the expense of supervision for her children.

A recurring theme in relation to Cavina's parental role was that she always worked and did not have time to be home with her children.   Another theme was her vulnerability to questionable relationships, which failed to enhance her role as a mother.   Andrew stated that he loved his mother and he admired her hard work to provide for the family.  However, he expressed regret that she did not have time for him or his siblings, though she seemed to have time for various men.

RAMSAY, ANDREW

Reportedly, Cavina took trips to Jamaica whenever she wanted a break from work.   It was on one of those trips that she met her second husband, Peter Brown.   She was over 20 years older than Peter, who was the same age as her son Andrew.   Cavina's life and the marriage to Peter ended tragically, dealing a final devastating blow to the relationship she had with her children, particularly with Andrew.

Andrew's answers indicate that his developmental years suffered at every stage, as if a consequence for being his mother's first-born son.   He related that he could be described as a "Mama's boy," but for him that meant he needed more of his mother than she was prepared to give him.   He learned that his mother gave birth to him at a time her life was in so much flux, she could not even identify his real father.

**Infancy in the Shadow of Twin Brother's Death**

Andrew's birth was overshadowed with the tragedy of his twin brother's death.      He lost his twin brother, Arthur Ramsay, about a month after their birth.      The loss of his twin brother had an injurious bearing on his early mental and emotional development.    There was an evolving consciousness of loss affirmed by the time he was 4 -- 5 years old and heard family members mention his twin brother.     When family members mentioned the loss of his twin brother, it solidified for him a sense of foreboding about his life.

A home environment insensitive to Andrew's need for emotional support aggravated the loss he felt.   His mother and other adult caregivers did not make him feel he could talk about the loss.     They told him about his brother and then expected him to just deal with the loss on his own.     The fact that his mother then left him to go to the United States created further anxiety.

While the aggrievement lingered over the loss of his twin brother, Andrew had an early inkling that he did not have a father.     The man whose surname he carried was Eral Ramsay, but Eral never lived in the home or took time to relate to him.     Unknown to Andrew also was that his mother had told another man, Roy Bartley, that he was the father of her child.

Eral Ramsay and Roy Bartley were two of several men Andrew's mother was involved with around the time of his birth.   Later in Andrew's childhood, he realized that his mother would, at her convenience, identify any of the men she was with as his biological father, regardless of the consequence to his wellbeing.    It dawned on Andrew that as the surviving twin child, he alone had to live with the emotional burden of never knowing his father.

RAMSAY, ANDREW

After his mother departed for the United States, Andrew's maternal grandmother Ethleen Davis took responsibility for his care.  He bonded with his grandmother though being with her meant he was moved around to various addresses.  As recalled by Andrew some of the places he had to live with his grandmother were in dangerous areas of Kingston, the capital city of Jamaica.     Nonetheless, he drew some comfort from his grandmother's presence.

Ann Marie, Andrew's sister, reported that they lived apart when their mother migrated.   She resided with relatives in St. Thomas, a rural parish in the south east of Jamaica, while Andrew resided in Jamaica's capital city of Kingston as well as in an area called Ensom City located in the parish of St. Catherine.     She confirmed that at some point in his childhood, he was living in the home of Eral Ramsay, the man initially believed to be his father.

According to Ann Marie, she and Andrew saw each other during school holidays and he seemed to relish spending time with her and other kids.   She related that when he was around other kids, he was naturally affable and, like other kids his age, he liked to play.

Ann Marie also saw signs that Andrew was prone to hurt feelings.   She recalled that on occasions Andrew would become sad and say he wished his twin brother Arthur were there to play with him.    She noted that Andrew withdraw sometimes from other kids and complained about missing his twin brother.  She corroborated that Andrew did not receive counseling or had the emotional support he needed at home and in school.   She said the culture in Jamaica dictated that Andrew was expected to simply "suck it up" no matter how badly he was treated.

**Sexually and Physically Abused at Age 8**

Andrew was living in the home of his then supposed father, Eral Ramsay, when he suffered repeated sexual and physical abuse.     He was 8 years old when the abuse started.     The primary perpetrator was a female housekeeper, but she was aided by the negligence of the woman whom Andrew believed was his paternal grandmother.

Andrew does not recall having any consistent contact with Eral, the man he was told was his father.  As recalled by Andrew, Eral was either constantly working or was in the United States.     In Eral's absence, Andrew felt at the mercy of the housekeeper and Eral's mother.

For about a year Andrew was forced into a cycle of sexual abuse by the female housekeeper. Andrew recalls the housekeeper holding him and touching and stroking his penis.     He also had to touch

RAMSAY, ANDREW

or kiss the housekeeper's private parts.     Andrew related that it was easy for the housekeeper to have access and control over him because she had the responsibility of taking care of him.     He was made to feel he had no choice but to accept whatever the housekeeper did to him, as he would be punished if he disobeyed.

The housekeeper punished him regularly through a pattern of beatings and torturous behavior. She beat him with whatever was at hand including sticks and belts with buckles.     Sometimes, she made him kneel for hours on uncooked rice grains until the grains pierced into his knees or he passed out. The beatings and rice gain torture were mixed in with the constant risk of sexual molestation.     The abuses left physical scars that would heal over time, but the emotional scars lingered and festered into adult life.

Andrew's horror deepened as he observed that his supposed paternal grandmother did not care about his suffering.     She also physically abused him.   Impressed upon him was that the Ensom City home was a loveless environment where the abuse and neglect made him feel he was going to die.

To escape the abuse and neglect, Andrew started to run away from home and seek refuge among the other little kids in the community.   Andrew was too young to realize that this desperate reaction of running away would have an influence on his behavior even after he migrated and started to live with his mother.

A searing memory for Andrew is that whenever he stayed away from the Ensom City home, it was inevitable that he would go back because he did not have anywhere else to go.     Nothing would change when he returned, as the housekeeper and his paternal grandmother tended to use his absence as another excuse to abuse him.

**Move to Maternal Grandmother's Home in Violent Community**

The abuse Andrew suffered in Ensom City ceased when his maternal grandmother, Ethleen Davis, took him back with her to Kingston.     He was happy to be back with his grandma as she was kind and caring.     He demonstrated his affection for his grandmother by doing chores and assisting in her care.  He had enough awareness to realize that his grandma was losing her eyesight and she needed him to help her around the house.

The need for mutual assurance between Andrew and his Grandma Ethleen was paramount in the volatile community where she resided.   Grandma Ethleen resided in an area of Kingston known as

RAMSAY, ANDREW

Dunkirk, which was beset with shootings.     Andrew recalls that much of the shootings were related to warring political factions in and around the Dunkirk community.     He and his grandma lived in Dunkirk shortly after the two major political parties in Jamaica, the JLP and PNP, had a long and violent general election campaign.

By the time the campaign culminated in a general election victory for the JLP, on October 30, 1980, close to 1,000 lives including women and children had been lost.   Reports on the violent election campaign and loss of life are accessible online.   Even after the election was concluded, hard feelings prevailed in certain communities where violence had taken hold.   As Andrew discovered, Dunkirk was one of the communities where violence was to be expected.

While living in Dunkirk, Andrew was exposed frequently to the sound of gunshots and scenes of dead bodies.     Such scenes added to the traumatic emotional impulses that were impacting the course of his development.     Andrew recalls that there was always the risk that he would become one of the dead bodies.

There was also the awareness that even at home, his grandmother could not protect him.   The safety concern accentuated a feeling of isolation or separation from the parents who were supposed to be there to protect him.     The clothes and money his mother sent from the United States could not compensate for her absence.   Furthermore, Andrew did not feel any consolation in hearing that he had a father residing in the United States, as he did not even know who that father was.

By age 10, Andrew's dream was to go to the United States to be with a mother and father. The expectation that his mother would send for him as soon as possible stimulated his dreams.   He tried to weather the high anxiety over conditions in Jamaica with hope that he would soon go to a better place.   He was comforted by television images or stories of a United States where kids and their families lived in happy, safe, loving, stable, and comfortable homes with access to nice schools.

## Migration to United States at Age 10

In November 1983, at age 10, Andrew migrated to the United States to be with his mother in the Bronx, New York.   His sister Ann Marie and his Grandma Ethleen also migrated.     The journey from Jamaica to his mother's home in the Bronx was filled with anticipation for a better life.     He was shocked when he landed in New York and the roads to his mother's home in the Bronx did not look anything he had imagined.

RAMSAY, ANDREW

As he observed, the area where his mother resided struck him as unpleasant, dense, cheerless, and intimidating.     The buildings were daunting and jammed together blocking out the sky like garrisons holding ghosts of tragedies he thought he had left behind in Jamaica.   When Andrew arrived at his mother's home, he was not prepared emotionally for the drab picture before him.     He walked into a small, cramped one-bedroom apartment which was in stark contrast to the mental image he had of what home would look like.

Despite the disappointing surroundings, Andrew was happy to meet his two younger brothers, Marlon Reid and Jermaine Bennett.   At the time, Marlon was 3 years old and Jermaine was 4 months old.  Andrew took some consolation from seeing his younger siblings and knowing that he and they and his older sister would be living in the same home.

Being with his siblings did not minimize Andrew's concern about the absence of a father.   An observation was that each of his mother's children was born to a different father.   However, unlike him, his siblings knew the identity of their respective fathers and they were less sensitive about the paternal absence.

Andrew recalls that when he arrived at his mother's home a man named Trevor was living there with her.    He did not think his mother and Trevor were in a relationship because she introduced Trevor as a tenant.    Shortly after, Andrew learned that his mother was married to one Tony Bennett, the father of her youngest child Jermaine.    It became obvious to Andrew that his mother's marriage lacked any benefit to him or his siblings, as Tony spent more time on the street or in jail than in the home.

Some of Andrew's earliest post-migration memories are of his mother taking him to see Tony in prison.    He recalls that the prison was upstate New York and his mother took a bus to go there.    It was his impression that the prison had certain special family days, which were the days his mother took him on her visits to Tony.    According to Andrew, on those special visits he had to separate from his mother so she and Tony could have some intimate time together.

At 10 years old, Andrew could not fathom why his mother was taking him to prison to see a man who did not even pretend to be a father-figure.     Andrew's siblings, Ann Marie and Marlon, corroborate that Tony was married to their mother but was a disruptive influence due to his criminal activity.

Andrew was so desperate for a father-figure that at times he grasped at whatever little interaction Tony offered.    This meant that whenever Tony beckoned, Andrew would walk with him to

RAMSAY, ANDREW

the corner store.  He noticed the deference other men on the street gave to Tony.    According to Andrew, Tony was big in stature and nobody troubled him.    He said people believed Tony was his father when they walked down the street together.  This made Andrew feel protected but he noted with dismay that Tony's behavior contributed to an unsafe home.    He indicated that though Tony did not abuse him, Tony was indifferent to the welfare of the family.    A stunning observation was that Tony brought criminal behavior into the home such as stealing from the family.

The lack of parental supervision contributed to the risk Andrew felt at home.    His mother, Cavina, did not have time to stay with him and his siblings.    Cavina maintained a two-job per day work schedule, which started when she left home at around 6:00 a.m. and ended when she returned home after 10:00 pm.    With no mother or father in the home, Andrew was forced to look to his sister Ann Marie who is only two years older than him.

Ann Marie reported that at 12 years old she was trying to be "the mother" to her siblings.  She indicated that it was easier for her to cope with the lack of supervision because she was mature for her age.    She indicated that even as a child, she had a maternal instinct that helped her to see the need to care for her brothers.

In recalling the challenges in the Bronx, Ann Marie related that Andrew's unmet needs at home was aggravated when his peers bullied him in school.    She confirmed that Andrew was afraid to go to school because classmates picked on him when they realized he was a new immigrant.    Andrew related that his lack of social exposure, low self-esteem, learning delays, simple appearance, and thick Jamaican accent were obvious characteristics that attracted the bullies.

Whenever Andrew returned home from school, he did not have any one to talk to about the bullying and the effects on his schooling.    His mother was not at home to hear his cries and there was no father to protect him.

**Sexual Abuse while Staying with 'Dad' Roy Bartley**

For the second time in his childhood, Andrew was sexually abused while staying in the home of a man his mother said was his father.    He was 10 years old and thus still a newly arrived immigrant when his mother introduced him to Roy Bartley, whom she proclaimed as his biological father.    Andrew called Roy 'Dad' and felt he had truly found his father.    His trust was exploited when, according to Andrew, Roy started to sexually abuse him.

RAMSAY, ANDREW

As recalled by Andrew, his penis was fondled, manipulated, and sucked by Roy who would compel him to keep his mouth shut about the abuse and to accept the molestation as normal.   He said that whenever Roy directed him, he had to put his mouth on Roy's penis.   Andrew recalled that he was also molested by an adult male who lived with Roy.      The sexual abuse at Roy's home went on for multiple years, Andrew stated.

Roy, also called Norman, reported that he had agreed to keep Andrew during the school week and then return him to his mother's home on the weekends.     On the surface, the arrangement appeared like it should have been a benefit to Andrew.   Roy said he had accepted paternity of Andrew and wanted to provide the support and supervision needed.      He emphasized his observation that Andrew was not getting any supervision from his mother at home.

Furthermore, as reported by Roy, he was a special education teacher in the New York City public school system and felt he could help Andrew improve in school.     He noted that Andrew was "slow" in reading and suffered from learning disability.    Roy reported that he has retired from teaching but continues to be a minister of religion at a Seventh Day Adventist Church in the Bronx.      He related that he tried to build his relationship with Andrew by identifying as a father, a teacher, and a pastor.

When asked about the issue of sexual abuse, Roy denied that Andrew suffered any kind of abuse in his custody.      He indicated, however, that his parenting style with Andrew was extremely strict and forceful.   This acknowledgement corresponds with Andrew's impression that Roy did not allow him the freedom to express anything contrary to what Roy wanted.    As such, Andrew felt that if he complained it would just expose him to more abuse from Roy.   Although Roy said he kept a close interest on Andrew's schooling, he admitted that he was unaware that Andrew was bullied in school.

Roy indicated that his problematic relationship with Andrew's mother, Cavina, affected his relationship with Andrew.     According to Roy, he and Cavina had a casual sexual relationship in Jamaica when he was a high school teacher and she was one of his students.     He said that when Cavina became pregnant, she told him that he was the father of the baby, Andrew.      Roy said he accepted what Cavina told him and, even after his relationship with her ended, he was willing to provide support for Andrew. He said the belief that Andrew was his son influenced the decision to play a role in Andrew's life when Cavina migrated.  It was easy for him to reacquaint with Cavina after she migrated because he also lived in the Bronx.

RAMSAY, ANDREW

Reportedly, Roy's relationship with Cavina, and with Andrew, took another dubious turn when he filed a petition seeking legal custody of Andrew.    According to Roy, his petition was prompted by concerns that Andrew would be better off in his custody because Cavina's home lacked supervision and structure.  He indicated that an unintended consequence of his custody petition was that it put Andrew under a lot of undue emotional stress.

Roy explained that it was revealed during the custody proceedings that he was not Andrew's biological father.   According to Roy, the revelation was a shock to him but, apparently, Cavina always knew that Andrew was not his son.      Roy recalls that Cavina insisted on the paternity test after he filed the custody petition.    The result of the paternity test quashed the custody petition, Roy stated. Furthermore, the test reignited questions for Andrew as to the identity of his father and why his real father would not step forward to help him.

**Mental and Emotional Functioning Worsened by Poor Interventions**

Andrew exhibited learning and emotional difficulties since elementary school.    However, according to his "dad" Roy, Andrew did not start to receive special education services until middle school.    The delayed support he received in school upon migration was disappointing to Andrew.   He noted that when he started going to school in the Bronx, he was made to feel stigmatized because of his immigrant status.

The first school Andrew attended upon migration was PS 79, an elementary school in the Bronx, which should have set the foundation for his educational advancement.      His sister Ann Marie corroborated that he was bullied and dispirited at the school rather than assisted academically.   The second school Andrew attended in the Bronx was IS 206B, where he was reportedly assessed for special education services.    Reportedly he was assessed learning disabled, though emotional disturbance also affected his performance in school.

By the time Andrew entered IS 206B, he was prone to post-traumatic stress, depression, anxiety, and other psychological disorders.    He was admitted to an outpatient mental health therapy program in the Bronx.    Though he could not recall the name of the mental health facility, he said it was in the vicinity of 186th Street and Fordham Road in the Bronx.     It was difficult to match the recalled location with an existing mental health facility.  He suggests the facility might have closed since he went there in the late 1980s and his admission there was for a short time.

11

RAMSAY, ANDREW

Andrew said his brother Marlon also went to the mental health facility for counseling.    He recalls that Marlon had Attention Deficit Hyperactivity Disorder (ADHD).    When interviewed for this report, Marlon related that he was young at the time of the counseling, and so he accepts Andrew's recall of events.

What Marlon distinctly remembers is that the lack of parental supervision at home was stressful for Andrew.    Marlon indicated that the pressure to be the male role model in the home fell on Andrew as the oldest male child.    He recalls that Andrew was a protective big brother but was too young to be saddled with the responsibility of being man of the house.

Andrew noted his mother's questionable relationship with various men added to the pressure he felt to be protective of his brothers.    These men were false dads, abusers, criminal offenders, suspicious husbands, and strangers who become house guests.    He noted, too, how easily his mother could pawn him off to any man she chose to name as his father without thinking of the effect on him. This tactic by his mother put him on an emotional roller coaster, exacerbated by the constant risk he felt of falling deeper into despair.

Andrew indicates that the abuses he suffered as a 7-year-old in Eral Ramsay's home and, subsequently, at 10 years old in the home of Roy Bartley left emotions that lingered into adulthood. He said the trauma he felt was compounded by the attitude of both men when he tried to engage them to find a resolution to his emotional conflict.

A telling encounter for Andrew was when he spent a summer holiday in New Jersey with Eral Ramsay, whose interaction with him was physically and verbally abusive.    At the time, according to Andrew, he was about 16 years and hoping that Eral would treat him like a son.    Another dire development revolved around Andrew's attempts to find a way to address the abuses he suffered from Roy Bartley.    According to Andrew, his attempts to communicate with Roy about the abuse were met with denial or deflection.    Andrew said he has had to learn to forgive Roy as part of his mental and spiritual path to healing.

The psychological disorders Andrew endured in childhood made him susceptible to poor impulse and behavioral regulation.  He was especially vulnerable in an environment where he was constantly tested to demonstrate that he is tough enough to survive.    Home and community presented numerous adverse circumstances to trigger a sense of crisis, and that his life depended upon his ability to comply with directives beyond his control.

RAMSAY, ANDREW

**Difficulty Assimilating in Hostile Environment**

Andrew's assimilation to the United States was diminished considerably by a hostile social environment.    When Andrew was 13 years old, his mother became a naturized citizen of the United States.    As a minor, he became eligible for derivative citizenship based on his mother's naturalization. However, Andrew was never allowed to feel like he was an American citizen in an environment where he continued to face bullying for looking and talking differently than his peers.

From 10 to 12 years old, Andrew resided at 2055 Creston Avenue in the Bronx and, from 12 years old to the time of his arrest he resided at 1886 Harrison Avenue in the Bronx.    In both neighborhoods, he felt like he was in unsafe territory.

Ann Marie indicated that her escape from the Bronx was to move out of the home when she turned 18 years old and to eventually relocate to Florida, where she currently resides and work.   She recognized that Andrew was still too young to move out on his own, and thus he remained stuck in a community where his vulnerability was exposed.

At 10 years old, Andrew was assaulted repeatedly in the Bronx when he went to school and when he was returning from school.     As Andrew recalls, the bullying had become a ritual in which the black American and Hispanic kids would confront him in school.     At the end of each school day, the same kids would lay wait him so they could beat him up.

The daily risk of victimization in school or at other places was a powerful shaper of Andrew's relationship with the community.  After a while Andrew felt compelled to fight rather than take flight because he could not always outrun the bullies.     On any day, he could be forced to fight and to be hypervigilant because another kid could attack him just for being different.

A related shaper of social susceptibility was the risk of abuse at home.  It seemed pointless to seek the protection of his mother or any of the men she said was his father, as each of them was likely to abuse him further.      His mother, Cavina, was quick to beat him rather than have a conversation with him.    He recalls that one day he was in the shower when his mother came into the bathroom with an electric cord in her hand to beat him.

Andrew's vulnerability to the environment escalated when the family moved to 1886 Harrison Avenue.      Their Harrison Avenue Home was an apartment in a New York City housing project.  Rather than lessen the risk to Andrew, the move to the Harrison Avenue projects increased his risk of harm.

RAMSAY, ANDREW

An immediate observation was that the projects' residency was dominated by African Americans and Hispanics, which he feared included some of the kids who bullied him in school.

About a year after he moved to Harrison Avenue, he met some Jamaican kids who were neighbors.   These Jamaican kids were Derrick McKennon, Dwayne Ranger, and Aquilla McKennon and they resided with their mother, Maria McKennon.     Derrick and Aquilla indicated that their mother's apartment was like Andrew's second home.   They corroborated that Andrew's mother, Cavina, was hardly home, and so Andrew and his siblings were unsupervised.     They also noted that Andrew, as the oldest male child at his home, felt pressure to be the protective big brother, though he was a kid himself in need of attention.

Both Derrick and Aquilla noted that unlike Andrew's mother, their mother came home from work at a certain time in the day so there could be family time.     Aquilla recalls, for instance, that Sunday at her mother's apartment was set aside strictly for family day, and Andrew and his siblings would come over for dinner and fellowship.

When asked about their adjustment versus Andrew's, Derrick and Aquilla indicated that they had an attentive mother who helped to make them feel safe at home.   Aquilla also related that though she and her brothers were of Jamaican heritage, they had the advantage of being raised in the United States, which contrasted with Andrew's experience as an immigrant child coming into a tough neighborhood.   She explained that she and her brothers were better able than Andrew to relate to the largely African American and Hispanic residents without fear of being bullied or alienated.

Andrew was described as a friendly and pleasant person who sought comradery rather than confrontation.   Derrick and Aquilla indicated that Andrew's natural tendency to reach out for companionship and kinship was not matched by a maturity to discern the difference between a friend and a fiend trying to manipulate him.

Andrew became especially susceptible to the Jamaican teenagers and adult males who hung out in "Jamaican neighborhoods" a few blocks from the projects where he resided.     He was about 14 years old when he started hanging out in those communities.     Initially, Andrew felt welcomed and safe among the Jamaicans who were more willing to accept him as one of their own rather than to reject or bully him.  He admits, however, that hanging out on the street with the other Jamaican youth became complicated when they started pressing him to sell drugs.

RAMSAY, ANDREW

Andrew indicated that he felt caught between his desire for a safe, normal life in a family setting and the need to maintain a relationship with the Jamaicans who offered the only social space where he felt accepted.      A recurring issue expressed by those who were close to Andrew is that although he was on the street, he craved any opportunity to spend time in a stable home.   A related theme is that he tried to protect his siblings and close friends from the streets.

Marlon indicated that one of the reasons he was saved from the streets was because his brother Andrew never encouraged him to hang out on the streets.      He noted that when Andrew was home, his personality did not reflect the streets but rather he was a caring, loving, and genial big brother who wanted the best for him.

Colleen Thompson, a close childhood friend of Andrew's, and his current girlfriend, recalled that when she met Andrew his personality was pleasantly different from that of the other Jamaican boys who hung out on the street.   She recalled that Andrew was one of the friendliest faces she saw in the Bronx Neighborhood after she migrated to the United States in 1989.

Colleen was 11 years old when she met Andrew who was 16 at the time.   She recalls that Andrew hung out in and around the Simpson Street area of the Bronx, where there were a lot of Jamaicans.      She has an older sister, Nicola Williams, and a close family friend, Sharon Brown, who both noted that Andrew did not want to be on the street and he related to them like family.

Nicola (age 46) reported that Andrew would come by the family house in the Bronx to spend time with her mother.      She said her mother talked about Andrew's politeness, pleasantness, and respect for his elders.      Nicola related that Andrew always treated she and her sister, Colleen, with love and respect and he never wanted anything bad to happen to them.      Both Nicola and Colleen indicated that they benefitted from Andrew's protectiveness and encouragement, despite the challenges that complicated his own life.

Nicola currently resides in Conyers, Georgia, where she is employed in social services and is attending university.   Colleen currently resides in Webster, Massachusetts, and works in nursing. They both indicate that they have had the benefit of being able to move to environments that were safer and less stressful than the Bronx, where Andrew felt trapped.   Their close friend, Sharon Brown, also expressed a similar sentiment about the challenges Andrew faced.

Sharon (age 48) reported that she was like a big sister to Andrew when they were growing up. She recalled that when she resided in Brooklyn, Andrew would visit sometimes to spend a few days with

RAMSAY, ANDREW

she and her then young son.     She could see that he just wanted to be somewhere he could feel like a normal kid among family.

Another place of refuge for Andrew was the home of his "cousins" Jennifer Mitchell and Juliana Facey.     Jennifer and Juliana are the nieces of his "dad" Roy Bartley.     The bond Andrew had with Jennifer and Juliana was maintained even after he found out that Roy was not his biological father.     In recalling their relationship with Andrew, Jennifer and Juliana stated that their uncle would take him to their home to spend time with them.     They related that it was always a pleasure to be around Andrew as he was kind-hearted, genuine, and pleasing in personality.

Both Jennifer and Juliana expressed that they grew up with certain advantages that were denied Andrew.     They cited that they were raised in an area of the Bronx that was safer than the area in which Andrew was raised.     Juliana indicated that it was perhaps to her advantage that she was a younger child than Andrew, as this meant she got to be sheltered from many of the outside risks he faced.

Juliana, born July 24, 1982, was still a young girl when Andrew was a teenager and would visit her home.   She related that Andrew used to babysit her and, since that time, she found him to be a family-oriented person.   As Juliana grew into greater awareness, she recognized that Andrew's desire for family could not be separated from insecurities he has had to live with throughout his life.

Juliana, who currently works as a licensed practical nurse, stated that one of the issues to haunt Andrew was not knowing the identity of his father.     She also learned that Andrew carried the emotional trauma of losing his twin brother in infancy.    A compelling moment for Juliana is that when her father died, Andrew cried like a baby.

Both Juliana and Jennifer indicate that the Bronx neighborhood in which Andrew resided was too high risk for a child with his vulnerabilities.     Their sentiments were like those of others who grew up having a close relationship to Andrew.

Andrew's close friend, Derrick, remarked that it would be an understatement to say the neighborhood was bad.   He said drugs and violence were modeled like a normal way of life.   Derrick related that there was hardly anything in the neighborhood to protect kids from exposure to the drugs and violence.   He indicated that one reason he was saved from the streets was because a pastor in the neighborhood took an interest in him.   He said the pastor started an afterschool program and was caring enough to allow him to attend.     "There were not too many people in the community who cared about the kids," Derrick said.

RAMSAY, ANDREW

Derrick reported that he lost an older brother to violence in the neighborhood.   During the interview for this report, Derrick said it was coming up to the anniversary of when his brother was killed. He indicated that his late brother's death was a devastating reminder of the violence in the neighborhood.  He said Andrew and his late brother shared the same first name and were friends.   He related that the loss was devastating on the surviving Andrew.

The tragic losses Andrew had to endure throughout his childhood made it seem that each death meant the risk to his existence had gotten closer.    He continues to feel appalled at the circumstances he faced in the Bronx to which he felt compelled to comply.   The observations of siblings and close friends indicate that even as Andrew was protective of them, he was under tremendous emotional and social pressure to survive an environment where he was highly vulnerable to harm.

**Youthful Impressionability in a High Crime Environment**

Andrew was 13 years old when an adult male in the community put a gun in his hand and told him to stash it.     The incident was both shockingly dangerous for Andrew and instructive.      He felt he could not reject the gun being pushed into his hand and it was a lesson that his survival, in that moment, was linked to carrying out the gunman's directive.     Related to that lesson was that as a youngster in the community, he should be prepared to risk arrest and sentencing to prove loyalty to adult offenders or hardcore juvenile delinquents.     An assumed threat was that if he did not comply, the same gun he was told to stash could be used to kill him and his family.

The incident for which Andrew was convicted in federal court occurred when he was 18 years old.  Despite his chronological age, developmentally he was a teenager rather than adult.  Delays in his intellectual, emotional, and social development, compounded by a range of traumatic events since early childhood, meant that his mental capacity at age 18 could not be judged to be on par with that of an adult.

In a report published May 26, 2017, the United States Sentencing Commission, described federal defendants under age 25 as youthful offenders rather than as adult offenders, and further, the Sentencing Commission gave credence to the consideration that someone under age 25 (as Andrew

RAMSAY, ANDREW

was) should not be rendered the same level of culpability as an adult.[1]  The Sentencing Commission drew upon scientific data on brain development, which the Supreme Court has used.[2]

One of the conflicts Andrew faced at 18 years old was that he never felt like he was in control of his decisions and judgment.  He felt constrained by his still youthful need for acceptance from those who seemed more capable than he was to survive in a hostile environment.    The dependence on those individuals was elevated emotionally by the effects of neglect and abuse at the hands of caregivers, whose actions made him feel thrown to the wolves on the street.

As Andrew revisited his memories, he admits that his exposure to the streets was a reaction to events in the home.   As he did as a young child being abused in Jamaica, he reverted in the Bronx, at age 13, to running away from abusive and neglectful caregivers.    At that time, he was struggling with abusive conditions whether he was staying in his mother's home or in the home of his "dad" Roy Bartley.

Added to Andrew's insecurity were the times he was locked out of his home as a means of punishment for being outside.    Being locked out further encouraged him to seek shelter on the streets, particularly from other Jamaican immigrants.     He would sleep in "different guys' houses." This helped to foster a sense that he could not afford to offend anyone whose help or protection he might need.

According to his "dad" Roy, Andrew was slow in relation to his peers and tried to be likeable by acting like the class clown.    Roy indicated that as a special education teacher, he knew Andrew's learning disability made him vulnerable to the influence of his peers.    He did not see Andrew as a leader in relation to his peers, but rather as someone who follows.    Roy expressed that he became concerned about Andrew following the wrong crowd when Andrew started to smell of marijuana.    He recalled that on one occasion, he glimpsed Andrew on a corner with some guys who were selling drugs in the Fordham Road area of the Bronx.

---

[1] Report entitled Youthful Offenders in the Federal System, retrieved online at www.ussc.gov.  The United States Sentencing Commission in its research of the youthful offender population in the federal system looked at policy and other issues that affect sentencing, treatment, and housing of such offenders.   For the report, the Commission defined youthful offenders as "25 years old and younger" at time of sentencing in a federal court. This definition, as the Commission stated, was informed by the scientific studies on "brain development and age, coupled with recent Supreme Court decisions recognizing differences in offender culpability due to age …"
[2] Ibid

RAMSAY, ANDREW

Andrew indicated that his reliance on the support and shelter of the Jamaicans on the street overly exposed him to drugs.   He indicated that the same kind of guys who might put a gun in his hand would be the same type who gave him drugs to sell or use.      He recalls that at around 14 years old, he entered a drug treatment program at a Daytop Village in the Bronx.    He indicated that his drug of choice was marijuana.

The availability of guns and drugs engendered in Andrew that the Bronx he saw when he arrived at 10 years old would not change.      In 1992, when he was 18 years old, his Bronx community still provoked in him a pervasive feeling of risk to his life.  Accompanying that feeling was street pressure to demonstrate group identity to project a semblance of protection.

Andrew indicates that at 18 years old, he was a traumatized, insecure, depressed, needy youngster, feeling he had to project strength and confidence because others demanded it of him in a violent environment.

**Lack of Trust in Authorities to Provide Safety/Protection**

A significant consideration was that Andrew lived in a community where police action on crime meant little when such action did not induce a sense of trust and safety.    Since the time he was being bullied and assaulted by school peers, Andrew had no reason to believe the authorities would protect him.    As a poor Jamaican immigrant living in the projects, it seemed his need for safety was not a priority for law enforcement or other social institutions.    The lack of confidence in the authorities came amidst the consistent presence of drug dealers and gang members whose influence, though undesired, imposed a type of protective order against rivals from outside.

In a sense, Andrew was left to believe that unless he learned to navigate the code of street life, he would be killed and his death might not even be counted.    This anxiety was pertinent despite reports suggesting that major felonies were on a downward trend in the 1990s, including 1992 when the offense occurred for which Andrew was arrested.

A New York Times report, dated January 2, 1993, cited police statistics to examine a "slight dip" in crime in New York City for 1992, but a breakdown of statistics was "not available" for Manhattan and the Bronx.[3]    As referenced in a Reuters news report, dated March 9, 2012, a NYPD internal

---

[3] Slight Dip in Homicides in New York City in 1992; published in New York Times January 2, 1993; retrieved online at www.nytimes.com

RAMSAY, ANDREW

department investigation validated that there was a pattern of NYPD crime rate numbers being manipulated and undercounted, apparently to make the crime statistics look better than they were.[4]

A review of the historical crime statistics posted online by the 46th precinct, which serves the community where Andrew resided, does not reveal statistics for 1992.  The precinct's statistics were posted for 1990, 1993, 1998, 2001, 2019 to indicate a downward trend,  Nonetheless, given the totals for major felonies for 1990 (8,710) and 1993 (7,515), it seems that crime in the period 1990 – 1993 was still high enough that it could aggravate in Andrew a feeling of existential risk.

**Education**

Andrew's public-school education ended in the 9th grade while he was enrolled at Theodore Roosevelt High School in the Bronx.     At the time, the school system failed to meet Andrew's need for a safe and supportive educational environment.  In that regard, Andrew continued to face the prospect of being a victim of assault and a lack of effective services to meet his special learning needs.    As indicated by InsideSchools.org, Theodore Roosevelt High School was closed eventually by educational authorities due to issues of safety and poor performance at the school.       Additionally, the school's campus was dividend into smaller schools.     Theodore Roosevelt High School was the second of Andrew's schools in the Bronx to be closed eventually due to poor performance.    The first of those schools was his elementary school, PS 79 (as reported by InsideSchools.org).      Reportedly, Andrew began to receive special education services in middle school, IS 206B, for learning disability, though he should have been receiving such services since elementary school.    As of the date of this report, special education records from the NYC Department of Education were not received.

**Employment**

Andrew indicates that the only long-term employment history he has relates to the work assignments he obtained while in federal prison.    He reportedly did odd jobs prior to his lengthy period of incarceration.  While incarcerated, he has improved his skills and employment prospects by undergoing vocational training and participating in job programs to earn an income.

---

[4] NYPD report confirms manipulation of crime stats; published by Reuters March 9, 2012; retrieved online at www.reuters.com

RAMSAY, ANDREW

## Mental and Physical health

Andrew's responses indicate childhood exposure to post-traumatic stress disorder, depression, anxiety, given the devastating psychosocial stressors he faced since early childhood.   The impairing effects of such exposure on intellectual, emotional, and social functioning continued into the period when the incident for which he was arrested occurred.     Inadequate or ineffective mental health services in childhood contributed to his vulnerability.

As reported by Andrew, he has a history of eye treatments while in custody.   There is also a reported history of asthma.    BOP medical records for Andrew have not been received.

## Traumatic Losses while Incarcerated

The ability of Andrew to make a swift adjustment to incarceration was impeded by the emotional effects of significant losses.     Reportedly, Eral Ramsay, the man Andrew was initially led to believe was his father, and whose surname he carries, died of cancer in 1996.   Thus, Eral's death occurred in the same year that Andrew was taken into federal custody.     Despite their strained relationship, it was emotional for Andrew when Eral died.

Shortly after Eral's death, Andrew lost his maternal grandmother Ethleen Davis.     The bond with his grandmother started early in his childhood when she was the only caregiver who did not abuse him.    That bond also entailed memories of helping to care for his grandmother when she was unable to see due to blindness.    Upon migration, having his grandmother in the home was oftentimes the only comforting memory.

The most devastating loss of all was that of Andrew's mother, Cavina, who was shot to death on September 3, 2011.     The circumstances related to Cavina's death begged for answers.  Even the newspaper report of her death was scant.  Andrew's siblings, Ann Marie and Marlon, recalled getting the news that their mother had been shot multiple times while she was on a visit to Jamaica. Reportedly, it was not unusual for her to make visits to Jamaica where she would visit relatives and her then husband, Peter Brown

The fact that Andrew was unable to attend his mother's funeral, due to his incarceration, extended the trauma and made it difficult to find emotional closure.    Instead of closure, he was left with troubling questions for which he had no answer.   One question was why the perpetrators of the shooting were not brought to justice?   Another question was whether his mother's history of dubious

RAMSAY, ANDREW

romantic or marital relationship had led to her tragic death and, relatedly, whether he carried some blame as the offspring of one of those dubious relationships?

Andrew recalls that he was disturbed when his mother chose to marry Peter Brown when he heard that he and Peter were the same age.    It was like she was marrying her son, Andrew said, as he recalled how conflicted he felt about the marriage.

Colleen corroborates that Andrew took the news of his mother's death extremely hard. According to Colleen, Andrew "bawled" when she gave him the news.   The emotions associated with his mother's death became wrapped up with a struggle about the purpose of his own existence since their fates seemed tied together.    It was not lost on him that while he was serving a life sentence for murder, his mother's life was ended by an act of murder.

**Spiritual and Moral Growth**

Andrew credits a religious conversion with helping him to start re-orienting his life to a path of redemption and rehabilitation.    He is a professed "born again" Christian who recalls vividly the time he prayed and accepted Jesus Christ into his life.    He admits that he is not saying everything is now perfect as he realizes his Christian faith is a work in progress, which includes the capacity to demonstrate improvement in his outlook and conduct.    He indicates further that his faith has allowed him to work even more diligently on improving his life at a time when pessimistic feelings threatened to overwhelm him after his mother died.

Andrew's conversion is corroborated by his childhood friend, Colleen, whose interactions with him over the years helped to lead him to conversion.    Colleen related that she started to realize a change in Andrew since 2009, which indicated to her that his conversion was genuine.    Colleen explained that she was a practicing Christian prior to 2009, and she would talk to Andrew about faith. She noted that eventually Andrew became receptive and accepting of the possibility for spiritual, mental, emotional, and behavioral change in his life.

Colleen also noted that whatever small income Andrew earned while working in prison, he contributes a portion to the charitable ministry of her church.    According to Colleen, Andrew has also contributed whenever possible to the purchase of clothes and other items to be sent to a church in Jamaica that distributes such items to the poor.

RAMSAY, ANDREW

Their shared faith has drawn Andrew and Colleen closer over the years.    As acknowledged by Colleen, they are currently in a relationship and she is open to the possibility of marriage should Andrew be released.      Prior to the closure of prisons to visitors due to COVID-19, Colleen visited Andrew whenever her work schedule allows.    Even though she has been unable to visit him, they have maintained regular communication.

Another shared interest that drew Andrew and Colleen closer is his relationship with her son, Jahir (age 19).    When Jahir was having learning and emotional difficulties in school, Andrew was the one who encouraged him to improve and keep on a straight path.    She said Andrew's counseling intervention also helped to preserve the relationship between she and her son.      Jahir refers to Andrew has his uncle, Colleen said.

Others who have had regular communication with Andrew since his incarceration also attest to changes in his outlook.    Family and close friends express that he comes across as a spiritual or religious man who quotes the Bible and seeks to provide counsel.

Juliana Facey expressed that Andrew's spiritual growth makes her believe that prison ended up saving his life.      When asked to elaborate, Juliana related that the community in which Andrew was raised had so much danger and pessimism that, if he had remained on the street, his life would not have had the opportunity to change.    She indicated that it was difficult for the young Andrew to resist the pessimism on the street because he lacked the maturity or the spiritual grounding, but the Andrew she now interacts with is a mature man with a sure spiritual foundation.

**Rehabilitation while Incarcerated**

During recent interviews with Andrew, he reported on his educational courses that should lead to a GED diploma as well as a degree or certification in Christian Ministry.      His educational interest is in keeping with his motivation for religious based work, particularly in counseling at-risk individuals. According to Andrew, he would like to become involved in outreach to at-risk youth in the community to help them avoid the mistakes he made.

A key component of Andrew's spiritual and moral growth has been the impact on his psychological wellbeing.   He indicates that he is in a much better place mentally and emotionally in relation to his capacity to deal appropriately with long-term stressors.      During interviews, he does not make excuses for past mistakes or for errors in judgment that might occur even as he remains keenly focused on rehabilitation.    He indicates further that part of his growth is being able to move past

23

RAMSAY, ANDREW

resentment and to learn to forgive.    Andrew indicated that learning to forgive has helped him to focus not only on healing, but also on the possibility for a productive future.

Records related to Andrew's federal incarceration confirm his participation in educational programs.    An inmate education form record shows a list of courses that Andrew has been involved in from 1998 to the present.    These courses include GED classes and a college correspondence course, both of which Andrew reported as ongoing.    Some other courses or programs listed include Alternatives to Violence (2015), Stress Management (2012), Drug Education (2014), Physical Fitness and Behavior Modification (2012), ACE Sign Language (2019), Tooling Class (2015).

Andrew's records also corroborate a history of employment while in federal custody. Currently, he works in the UNICOR job program at FCI Schuylkill, Pennsylvania, where he is housed.    A UNICOR performance evaluation describes him as an "Excellent Worker."   The UNICOR job performance record also indicates that in October 2020, Andrew was promoted to pay grade 3 due to his "ability to conduct himself in a positive and professional manner."

A job competency record, starting in August 2020, confirms his achievement in various units: Forklift Workshop, Loading Dock & Warehouse Safety, Material Handling, Forklift Trainer etc.    On written tests related to units applicable to him, his scores included 100% (Loading Dock & Warehouse Safety), 98% (Material Handling Equipment Safety) 93% (Forklift Workshop), 82% (Forklift Trainer).   His scores in the practical tests also indicated progress in his job competency.

Several certificates of achievement also corroborate Andrew's path to rehabilitation while in federal custody.    One of the more meaningful certificates for Andrew is for completion of the Alternatives to Violence Project (basic level) in 2015.   This project is conducted by the Religious Society of Friends (Quakers) and, according to the program description, it is to help people "develop effective ways of dealing with conflicts creatively and without violence."

Other substantive certificates for Andrew that helped him to address stressful situations included courses in Self Discipline & Emotional Control, Stress management and Lifetime Fitness and Wellness, Drug Abuse Education, Physical Fitness, Wellness and Behavior Modification, Leading in Faith & Education (LIFE 1 and 2 courses).   Certificates related to vocational skills also made Andrew proud. These certificates were achieved for completing Alternative Building Practices, and the Forklift Workshop Training Program.

RAMSAY, ANDREW

## Prospect for Successful Reintegration to Society

Andrew's inclination towards rehabilitation programs is one of multiple key factors indicating the likelihood of a successful reintegration to society.      He has demonstrated marked improvement in mental, emotional, behavioral, occupational, spiritual, and moral capacity.     This has accorded him a greater sense of self-determination and purpose about his life.

Another key factor is that Andrew's current age helps to lower the risk of recidivism.      The United States Sentencing Commission has found that older inmates are less likely to re-offend than inmates in their twenties and thirties.     The Sentencing Commission's report on recidivism, published in December 2017, indicate a pattern of significant decline in recidivism for inmates in the 45 – 59 age group and continuing through the 65 and over age group.[5]     Currently, Andrew is 47 years old and thus fit into that age group where the likelihood of recidivism should decline appreciatively.

It should be noted that in addition to his age, Andrew has certain helpful indicators such as he did not have a criminal record prior to conviction in 1997, and thus could not be considered a career criminal.  Also, his demonstrated improvement while incarcerated has held true over several years and suggest a genuine move towards rehabilitation.    This improvement continues to be undergirded by a clearer moral sense (knowing right from wrong) and educational and vocational preparation.

Another notable factor towards reintegration is that Andrew has a network of supportive siblings, extended family, and true friends, all of whom have provided the support he needed to help him improve   These individuals have all pledged their support to Andrew's reintegration should he be released from custody.     Noteworthy, too, is that these individuals are not into street life, but are gainfully employed in various fields including social services and healthcare.     These individuals are equipped in terms of their maturity, career background, and knowledge of Andrew's history, to facilitate an appropriate environment for his re-entry.

Upon release, Andrew would not be returning to the troubled environment that influenced him at the time of his arrest.    Andrew's brother Marlon has made the commitment of accommodating him. Marlon resides in a three-bedroom home with his wife, his child, and a stepdaughter in New Haven,

---

[5] The Effects of Aging on Recidivism Among Federal Offenders; published December 7, 2017 as part of the US Sentencing Commission's research into recidivism.   Retrievable online at www.ussc.gov

RAMSAY, ANDREW

Connecticut.   Andrew's girlfriend, Colleen, has also committed that her home in Webster, Massachusetts is open for Andrew to stay upon his release.

This writer's impression, based on a visit to the respective homes of Marlon and Colleen, is that each home would be appropriate to help facilitate Andrew's resettlement or reintegration.   Another possibility is the home of his sister, Ann Marie, in Hollywood, Florida.   Given COVID-19 and travel constraints, no visit was made to Ann Marie's home.   Phone interviews and conversations with Ann Marie, however, suggest a stable and caring environment where she continues to accommodate her youngest brother Jermaine (age 37) who has a history of autism.

Andrew is encouraged by the favorable response from family members and close friends.   As part of his growth while incarcerated, he continues to cultivate this supportive network that has enabled him to internalize the possibility of a productive life outside of prison.

**Sentencing in 1997**

Family members expressed regret that when Marlon was being sentenced in 1997, he did not have the benefit of a comprehensive investigation into his social history and that they were not contacted or interviewed for such an investigation.   They express optimism that the Court, at this time, will be able to take Marlon's history into account.

**Mitigating Factors**

Andrew's social history indicates several factors that had an extraordinary influence on the shaping of his life.   Based on his history, the following mitigating factors are highlighted.   These factors are not exhaustive, given the totality of the factors in this report, but should be enough to merit the Court's consideration.

- **Unduly Harsh Exposure in Childhood to Psychological/Emotional Encumbrances:** Given the extraordinary stressful events that confronted Andrew since early childhood, it is not surprising that his answers indicate early symptoms of post-traumatic stress disorder, depression, anxiety, low-self-esteem that contributed to impairment in cognitive, emotional, social functioning inclusive of the period when the offense occurred.
- **Death of twin brother in infancy**: This instilled an early susceptibility to emotional disturbance evoking a pervasive sense of tragic void, foreboding feelings about his survival, and anxiety in relation to his environment.   Andrew's responses, and the early observation of his sister,

RAMSAY, ANDREW

suggest that although he never got to know his twin brother, the loss had a profound impact on his emotional development.

- **Sexual abuse in childhood from Caregivers including Supposed Father:** The fact that this pattern of abuse was inflicted on Andrew at two separate stages of his childhood made it extremely difficult for him to recover from the psychological trauma.   Andrew's answers indicate that into adult life he would have flashbacks of the abuse, as well as feelings of anxiety, fear that something was wrong with him, and guilt and self-blame.   The effect upon his psychological and social functioning is not uncommon, as borne out by research that shows childhood victims of sexual abuse are more likely than their non-abused peers to incur cognitive, emotional, and social difficulties that can contribute to delinquent behavior.

- **Childhood Victim of Physical Abuse and Neglect:** This exposure increased the risk for impairment in cognitive, emotional, behavioral, and social development, making him extremely vulnerable in school and social environments that offered little to no protective interventions.

- **Coercive Influence of Repeated Violent Victimization on Psyche and Conduct:** It was impressed on Andrew from early in his developmental years that complying with the demands or the will of his abusers was necessary for his survival or to diminish the threat of harm.   In an environment where he felt constantly at risk for victimization, there was a powerlessness inherent even in his efforts to resist or act strong, as such efforts also forced him into adapting to the abusive behavior he abhors.

- **Lack of Supervision and Structure:** This had a significant impact on the course of Andrew's life, illustrating that the deprivation of supervision and structure put children at higher risk for exposure to negative outside influences that can have catastrophic consequences.

- **Repeatedly Traumatized by False Claims Related to Paternal Identity:** Being lied to by his mother on multiple occasions about the identity of his father became a tragic theme in Andrew's life since early childhood.   The harm his mother's behavior inflicted on his developing psyche was beyond the pale and contributed to much of his difficulties.

- **Early Exposure to Violence as a Means of Conflict Resolution:** The environments in which Andrew was raised were replete with models of violent behavior as a tool to settle conflicts or stressful situations.    For an individual so exposed in childhood, such models posed risk of harm not only to physical wellbeing, but also to psychological and social development that can impact conduct.

RAMSAY, ANDREW

- **Mother's Inability to Engender a Sense of Healthy Emotional Attachments:** The relationship between Andrew and his mother set the foundation for the emotional vulnerabilities that contributed to the type of problematic attachment outside the home that was antithetical to his yearning for a secure, family-oriented relationship.

- **Poor Male Role Models and Absence of a True Father Figure:** This dynamic had far-reaching implications for Andrew's transition to adult life, as he was not only deprived emotionally but also of the protection and financial support a father could have provided to counter the risks to his wellbeing posed by the bullies, drug dealers, and gang members.

- **Institutional Failures to Provide Protective Interventions:** This failure on the part of societal institutions, such as the schools, law enforcement, and Child Protective Services, was a contributing factor to the difficulties he faced.

- **Poverty, Race, Immigration Barriers Increased the Risk for Adverse Outcomes:** It is likely Andrew would have enjoyed better access to social protections and resources, including educational interventions, to improve his prospects for a normal life if issues such as poverty, race, and immigrant status did not help to determine the neighborhood in which he had to reside.

- **Offense Cut Against the Grain of Natural Temperament:** Family and friends are consistent in describing Andrew's affable and supportive nature.  Based on their knowledge of the challenges he faced in childhood, there is a sense that his legal problems occurred at a period of his life when his ability to remain resilient had been compromised.

- **History of Tragic Losses including Death of Mother:** This had a debilitating effect upon his abilities for normal transition from adolescence to adulthood.   Each tragedy, culminating with the death of his mother when he was 37 years old and incarcerated, evoked a sense of crisis in his own life.

- **Age at Time of Incident:** Andrew's age (18 years old) meant he was still in close psychologically to the traumatic experiences of his childhood, and thus was more likely than not  to have reactions suggestive of  poor decision making and judgment and poor emotional/behavioral control, despite the law deeming him an adult.

- **Age at time of Offense and at Sentencing Merit Consideration as Youthful Offender:** As noted, the United States Sentencing Commission, in a May 2017 report/research, defined inmates under age 25 who come before the federal courts as youthful offenders.  The Commission cited scientific studies (and Supreme Court decisions) to support that the brain of individuals younger

RAMSAY, ANDREW

than age 25,  particularly the pre-frontal cortex of the brain that controls executive functions, is not yet fully developed, and thus lesser culpability can be assigned to an offender in that youthful range than would be assigned to an offender over age 25.

- **Youthful Age Recognized by US Sentencing Commission/Guidelines for Consideration:** The impact of Andrew's age at the time of the offense, and the cumulative effects of the traumatic events he endured since infancy, made for an extraordinary or unusual degree of influence upon his conduct.

- **Demonstrated Capacity for Change and Rehabilitation During Incarceration:** Records cited in this report confirm Andrew's excellent response to rehabilitative programs including educational courses, vocational skills, and emotional-behavioral regulation.

- **Support from Family Members and Close Friends Exceedingly Positive:** These enduring supportive relationships play an exceptional role in helping Andrew towards improvement while incarcerated, and this network of family and friends have committed to continue being there for him to assist in his reintegration to society should he be released.

- **Moral Development Undergirded by Spiritual Growth:** A consistent observation expressed by family and friends, who have maintained interaction with Andrew throughout his time in prison, is of the evolving moral clarity and spiritual maturation that have helped to bring about change.

- **Improved Ability for Appropriate Management of Stressors:** Andrew's maturation while incarceration has included a better understanding of the stressors that adversely affected his youth, and the need to employ safe and acceptable means of managing his emotions.   This understanding is evident in his participation in certain programs while in custody, such as emotional regulation, alternatives to violence, behavioral modification, drug abuse education, Yoga classes.

- **No Prior Conviction:** Andrew is not a career offender.  The 1997 pre-sentence report by the US probation officer confirmed that he had no prior history of criminal convictions.

- **Contrition for Past Actions:** This comes across as authentic and is in line with his efforts to learn from mistakes and to stay on a positive path.

- **Re-entry Plan to Include Building on Progress Already Made while Incarcerated:** This includes employment, involvement in religious-based community services such as counseling and charitable work, participation in programs that supports emotional and physical wellness.   A supportive network of family members and close friends has committed to be participants in helping with his re-integration.

RAMSAY, ANDREW

- **Low Risk of Recidivism:** Current age (47), and other pertinent factors indicative of improvement, support a lowering in the risk for re-offending.    Research carried out by the US Sentencing Commission on recidivism rates for federal inmates have found marked declines in recidivism rates for inmates in Andrew's age group.

## Conclusion

Andrew was 18 years old at the time the incident for which he is convicted occurred.    By that time, the traumatic events of his childhood had such an extraordinary impact that the mental, emotional, behavioral, and social effects would carry over into early adult life.    Developmentally, at 18 years old, he was more adolescent than an adult, despite the law deeming age 18 as the start of adulthood.   He was sentenced as an adult in November 1997, at age 24.  Since that time, the US Sentencing Commission has described an offender of that age as a youthful offender, whose exposure to culpability should be less than that of an adult offender.    Currently, also, an investigation of Andrew's background has been conducted and presented in this report for consideration.   Andrew has already served over 23 years in federal custody and, during that time, he has demonstrated mental, spiritual, and moral growth, and capacity for rehabilitation.   He is currently 47 years old, which fits within an age group (45 – 59) when the risk of recidivism is markedly lower than for an inmate in his twenties.    It is hoped that this report of Andrew's social history, inclusive of mitigating circumstances, will assist the Court in the consideration of granting the relief Andrew has humbly requested.

Respectfully submitted

/s/ *Conrad Lindo*

Conrad Lindo, LMSW-R
Mitigation Specialist

RAMSAY, ANDREW